(January 18, 1994)

■ Sophy P.Q. Haynes, Respondent, v Robert B. Haynes, Appellant. Miriam M. Robinson, as Guardian ad Litem, Respondent. [606 NYS2d 631] —Order, Supreme Court, New York County (Phyllis B. Gangel-Jacob, J.), entered July 13, 1992, which, inter alia, granted plaintiff's motion for summary judgment dismissing defendant's counterclaims for rescission of the parties' postnuptial agreement, directed defendant to pay the guardian ad litem's supplemental fee of $11,163.37, and directed a hearing on allocation between the parties of the guardian ad litem's total fees (including an earlier award of $13,377.15), modified, on the facts, to the extent of reducing the supplemental award to $5,500, and otherwise affirmed, without costs.

Defendant, an attorney, failed to rebut the heavy presumption that the deliberately prepared and executed postnuptial agreement manifested the true intention of the parties (Sagan v Sagan, 53 NY2d 635; Merrick v Merrick, 181 AD2d 503). His claim of fraudulent inducement based upon certain alleged oral representations is vague and directly contradicted by the specific disclaimer language of the agreement. Nor is there any showing of overreaching (see, Christian v Christian, 42 NY2d 63, 71-73).

Acknowledging that the total fee to the guardian ad litem awaits final allocation between the parties during the financial portion of trial, we would nevertheless modify the supplemental award downward as an exercise of our discretion (Matter of Schoonheim, 158 AD2d 183).

Twenty years old at the time of the guardian's appointment,

the parties' son has nonetheless been described as having a mentality equivalent to that of a four-year-old. Clearly, he is an individual "incapable of adequately prosecuting or defending his rights" on his own, and his representation by a guardian ad litem was thus based upon that incompetence rather than his age (CPLR 1201).

A duly appointed guardian ad litem is entitled to fair and reasonable compensation for his services (Matter of O'Malley, 286 App Div 869, 870), even where the result may be of no benefit to the ward (Livingston v Ward, 248 NY 193). Here, the guardian did make a significant contribution to a settlement that was beneficial to her ward. A guardian ad litem is not required to demonstrate at the outset of her appointment, as a condition precedent to compensation, the ultimate viability of her ward's rights or entitlements. Rather, as here, her task is to ascertain, through the legal process, what such entitlements might be. Having effectively done so in this case, she is entitled by law to compensation for her efforts.

While we retain discretionary authority (as indicated above) to modify the guardian's compensation award, we note that neither party to this appeal has questioned in this Court the power of a Judge to appoint a guardian to represent the child under these circumstances. (The only challenge to the guardian's jurisdiction before the trial court, as the dissent points out, was with regard to the question of custody, not support.) Even were we to adopt the dissenting position as a threshold approach, the most minimal due process would still require us to grant the guardian ad litem—who did not appear on this appeal—an opportunity to respond to this *sua sponte* challenge from the bench, which was never raised by any party.

Thus we find it inappropriate at this late stage to scrutinize the "jurisdiction" of the guardian ad litem's appointment, based solely upon a hindsight appraisal of the merits of the guardian's legal strategy. The dissenting opinion cites no legal authority for an appellate review of such widened scope. Concur—Ellerin, Wallach and Nardelli, JJ.

Murphy, P. J., dissents in part in a memorandum as follows: The present dispute over the amount to which the guardian ad litem is entitled, arises in the context of a divorce proceeding. The parties' son, Robbie, was born with Downs Syndrome and, although an adult, due to his particular manifestation of that syndrome, is unable to function intellectually beyond the level of a four-year-old. Robbie is institutionalized and will likely remain so for the balance of his life. The

plaintiff has sought custody of Robbie and in that context has sought support payments from the defendant. These requests have been opposed by the defendant on the ground that, even if the court possesses jurisdiction to render a custody and support determination as to an adult, it would not be in Robbie's interest to become the recipient of court-ordered support since his entitlement to public funds would thereby be jeopardized. The IAS Court, apparently assuming that it did possess authority to adjudicate the custody of an adult within the context of a divorce proceeding, and, accordingly, to make a support determination in connection therewith, thought it appropriate, in view of the defendant's substantive objections to the payment of support, to appoint a guardian ad litem to represent Robbie's interests and, *sua sponte,* did so by order dated November 14, 1990. At the time of the appointment, Robbie was twenty years of age and less than two months short of his twenty-first birthday which occurred on January 7, 1991. The guardian ad litem was also appointed notwithstanding an outstanding decree of the Surrogate's Court, dating from 1989, appointing both the plaintiff and the defendant guardians of their son's person pursuant to SCPA article 17-A.

In a memorandum of law dated November 27, 1990, less than two weeks after her appointment, the guardian ad litem indicated her support for the plaintiff's application to obtain custody of Robbie. Responding to the defendant's jurisdictional objections, she urged that the court did indeed have authority to adjudicate the custody of a person over the age of eighteen within a divorce action. Although conceding that case law provided no support for this contention, the guardian persisted in her advocacy of a custody determination, doing so on the novel ground that it was the mental and not the chronological age of the divorcing parties' children which ought to be determinitive in assessing the extent of the court's jurisdiction.

On January 28, 1991, the guardian ad litem submitted her final report. In contrast to her earlier more emphatic assertions of jurisdiction, the guardian now recommended only that *"[t]o the extent that the Court is in a position to make a custody determination,* it is clearly the plaintiff who should be awarded sole custody of Robbie" (emphasis added). It should be noted that no custody determination respecting Robbie has in fact been made, nor is there indication that any such determination ever will be made.

Having treated with the custody question, the guardian

proceeded to the issue of support as if its relevance in the underlying divorce action was in no way contingent upon the court's authority to adjudicate custody. Indeed, the relevance of the guardian's recommendations upon the support issue to anything which the court possessed authority to do was, to say the least, unclear. The guardian, of course, repeatedly recommended that Robbie's parents be ordered to support him, apparently without temporal limitation. But the utility of this recommendation was and remains far from evident, particularly in light of the guardian ad litem's practically contemporaneous acknowledgment of the fact that "the statutory limitation for parental financial support for a child is limited for up to 21 years". The guardian ad litem also urged, presumably as an alternative to an award of custody, that the court appoint the plaintiff as Robbie's committee pursuant to the then extant article 78 of the Mental Hygiene Law. However, leaving aside for the moment the fact that the appointment of a committee could not have been accomplished as an incident of the divorce action but would have required commencement by petition of a separate special proceeding (see, Mental Hygiene Law former § 78.03), the need for such an appointment was nowhere in evidence. As noted, a guardianship proceeding had already taken place in Surrogate's Court, as a consequence of which letters of guardianship over Robbie's person had been issued to both of Robbie's parents. There was no indication that, as joint guardians of Robbie's person, the plaintiff and defendant had defaulted in the discharge of their duties, or, indeed, that they had otherwise failed to meet Robbie's needs. Nor, for that matter, was there indication that the proposed committee would or could be any more responsive to Robbie's future needs than the already extant guardianship. The problem, at least the problem which the court purported to address, was not so much the stewardship of resources as their availability; as the guardian ad litem herself reluctantly recognized, there apparently were no funds other than SSI and health insurance benefits to which Robbie had a present legal entitlement. Yet, obviously, the appointment of a committee would not have augmented the resources to be used for Robbie's benefit.

Moreover, even if there had been some need effectively to modify the joint guardianship in accordance with the guardian ad litem's suggestion so as to name the plaintiff Robbie's sole guardian, the proper procedure would not have been the jurisdictionally baseless modification recommended by the guardian ad litem to be accomplished as an incident of the

divorce action, or even the commencement of a special proceeding for the appointment of a committee, but a motion for modification of the outstanding guardianship decree before the court having continuing jurisdiction over the guardianship, namely, the Surrogate's Court *(see,* SCPA 1755, 1758).

For her services, the guardian ad litem claimed fees in the total amount of $24,540.52. To the extent that the issue on this appeal is whether the guardian ad litem's request of this amount was reasonable, it would seem clear that the request, approved without reduction by the IAS Court, represented a gross overvaluation of the guardian's services and, indeed, that even after this Court's $5,500 reduction of the award, the guardian ad litem's services remain substantially overvalued.

Manifestly, the guardian ad litem's report contributed nothing to the solution of the problem the court had assigned itself. Indeed, it would subsequently appear that, as the defendant had initially contended, Robbie's entitlement to public funds might well have been endangered by his receipt of court-ordered support from the defendant. Thus, notwithstanding the guardian ad litem's conviction that the "[p]ublic policy of this state certainly does not provide that taxpayers shall pick up the cost in circumstances such as are here extant", the court endeavored to find a way to assure that taxpayers would indeed continue to "pick up the cost", even if Robbie was to become entitled to some form of court-ordered parental support. It was in the course of pursuing this inquiry—one which the guardian ad litem in her report had pointedly eschewed—that the court discovered during her examination of one of the *defendant's* witnesses that a supplemental needs trust might accomplish the ends which the court evidently deemed desirable. It is, of course, true that the defendant did eventually agree to establish such a trust with funds he received as a beneficiary of a testamentary trust, funds which he had in any case been contributing on a voluntary basis toward Robbie's support. But the defendant's agreement in principle to establish such a trust for the benefit of his adult son was not in any way traceable to the guardian ad litem's participation in the divorce action. Neither the idea of a supplemental needs trust nor the defendant's eventual embrace of the concept of employing such a trust was in any measure facilitated by the guardian ad litem's recommendations which amounted to little more than a bare insistence that the defendant be ordered to support his adult son on public policy grounds. Indeed, it is clear that the guardian ad litem was not merely dismissive of the defendant's apparently

legitimate concern that court-ordered support would impair Robbie's entitlement to public funds, but viewed Robbie's receipt of public funds as both unnecessary[1] and offensive to public policy and accordingly perceived no reason to explore any means by which Robbie's public entitlements might be preserved if, as she recommended, parental support were ordered.

As is hardly surprising given their evident inutility and unresponsiveness to the court's ultimate concerns, not one of the guardian ad litem's recommendations was followed; custody of Robbie was not awarded to plaintiff, no committee was appointed, and no order mandating parental support was entered. Instead, the court, perhaps having understood that it was without power to do more, attempted to promote a voluntary arrangement which would enable Robbie to have the assurance of continued parental support but which would not, the guardian's public policy views notwithstanding, disqualify Robbie from the receipt of public funds. Given the court's apparent rejection of all the guardian's recommendations, and, indeed, the fundamental inconsistency of those recommendations with the course eventually pursued by the court purportedly in Robbie's behalf, it is very difficult to understand the basis for the court's observation in connection with her approval of the guardian's fee that "the guardian ad litem contributed greatly to clarifying the issues and providing a framework for settlement." Even if the court's endeavor to provide financial security for Robbie had been a legitimate part of the divorce action, the guardian's participation did nothing to advance that objective, and if the guardian's participation is to be evaluated—if indeed it is a proper subject of evaluation—it should be evaluated accordingly.

The majority's discretionary reduction of the guardian ad litem's award, of course, presupposes that there was some legal basis for her appointment, for if there was not, neither was there any ground for her compensation, reduced or otherwise. The supposition in which the majority tacitly indulges as a condition of its discretionary reduction is, I believe, unfounded. At the time of the guardian ad litem's appointment the issues of custody and support were no longer adjudicable in this divorce action. As noted, the parties' youngest child,

---

1. The guardian stated in her report that "[I]n the face of extensive and complete medical coverage for Robbie and the apparent financial resources of both parents, this need for governmental financial contribution for Robbie is inexplicable."

Robbie, had long since passed his eighteenth birthday and, indeed, was on the verge of his twenty-first year. While the court may have had the best intentions, it ought to have been clear that it was powerless within the context of the divorce action to compel parental support for Robbie, either as an incident of a custody determination or otherwise. There quite simply was no legal support for the proposition, urged by the guardian, that the court's power to render a custody determination depended not upon the chronological but the intellectual age of the divorcing couple's children.[2] Nor was there any other legal ground for the adjudication of custody or support. To the contrary, it should have been plain that with Robbie's attainment of his twenty-first year, an event due to occur within weeks of the guardian's appointment, his parents' legal obligation to support him would come to a definitive end and would not be revivable by any judicial act appropriate to a divorce action.

While it is undoubtedly true, as the majority has observed, tracking the language of CPLR 1201, that Robbie is an "adult incapable of adequately prosecuting or defending his rights", it does not follow, as the majority suggests, that the appointment of a guardian ad litem was therefore appropriate. The inability of a person adequately to prosecute or defend his or her rights is not of itself a sufficient basis for the appointment of a guardian ad litem; there must in addition be some right in need of prosecution or defense. A guardian ad litem is appointed not to represent the ward's interests in any context in which they might conceivably be implicated, but for the far more limited purpose of appearing for the ward in ongoing litigation in which the ward's rights have been placed directly at issue. The relevant question then in assessing the propriety of the appointment of the guardian ad litem in this case, is not simply whether the proposed ward, Robbie, was capable of prosecuting or defending his rights, but whether there was any right of Robbie's that was to be adjudicated. And, clearly there was not; as noted, neither the custody nor the support of Robbie remained a legitimate issue in the underlying divorce proceeding, and no one has even suggested any other legal context arising in the course of the divorce litigation in which Robbie's rights would have been placed at issue. So far as can

2. The one case cited by the guardian in the course of her three paragraph argument in support of the court's assumption of jurisdiction was *Silverman v Silverman* (50 AD2d 824, 825), which, of course, far from supporting her position, states quite plainly, "[t]he age of majority for the purposes of custody is now 18 years (see Domestic Relations Law, § 2)".

be gathered from the record, the court appointed the guardian to ascertain whether court-ordered child support would imperil Robbie's receipt of public assistance and, if so, whether, there was some means of avoiding that consequence. But the assumption from which this line of inquiry proceeded, namely, that the court possessed authority to mandate parental support of an adult, was completely unfounded. The court simply had no jurisdiction to make the ruling whose potentially problematic consequences the guardian ad litem had been appointed to address. Plainly, the statute does not countenance the appointment of a guardian ad litem to appear for an infant or incompetent in a context in which the court is powerless to affect the proposed ward's legal rights. The mere fact that the proposed ward may be, generally speaking, "incapable of adequately prosecuting or defending his rights" is itself of no consequence; it is only when this incapacity is considered in conjunction with the court's present power to affect the proposed ward's rights, that the appointment of a guardian ad litem becomes appropriate.

The majority attempts to sidestep the rather obvious jurisdictional invalidity of the guardian ad litem's appointment upon the ground that neither party questioned the court's power to make the appointment. The implicit contention that the jurisdictional issue has been waived is without factual basis. Although the complete record of the underlying divorce proceedings is not included in the present appellate record, it is quite apparent that the defendant did lodge jurisdictional objections to the court's address of the custody issue, and it was expressly to these objections that the guardian addressed herself in her memorandum of November 27, 1990.[3] That the defendant may not have specifically objected to the court's *sua sponte* appointment of a guardian ad litem is of no moment; it was sufficient that he registered his objection to the court's initial assertion of jurisdiction over the subject matters, namely, custody and the ancillary issue of support, in which Robbie's interests would have been affected, if at all, for there could have been no authority or, for that matter, reason for the appointment of a guardian to represent interests which the court in the proper observance of its jurisdictional limitations would have been powerless to affect.

---

3. That memorandum states in its second paragraph, "[D]efendant opposes plaintiff's application [for custody] alleging that (a) this court is without jurisdiction to award custody" and then goes on to argue in a separately headed section "THE SUPREME COURT HAS JURISDICTION TO AWARD CUSTODY IN THIS CASE".

No one, I think, would argue that the objective of providing financial security to a severely disabled person was unworthy. But neither do I think it arguable that not even a worthy objective may be judicially attained when it is not a proper subject of adjudication. The ends do not justify the means, particularly when the means involve an inappropriate assertion of judicial power. This Court's present willingness to indulge the IAS Court's foray into areas foreign to its authority may perhaps arise from a perception that the result of the excursion was entirely benign. That, however, is simply not so. The single tangible outcome of the court's venture is not a "settlement" providing Robbie with the assurance of continued parental financial support—for indeed there is no evidence of any "settlement", court-ordered or otherwise, in the appellate record—but rather the guardian ad litem's bill for $24,540.52, ultimately to be paid by one or both of Robbie's parents. Manifestly, this completely unwarranted charge upon the assets of those who, to all appearances, would, consistent with their financial ability to do so, voluntarily continue to contribute to their adult son's support, does nothing at all to advance, and may in fact significantly impair, the interests on behalf of which the court purported to act.

Accordingly, the order of the Supreme Court, New York County (Phyllis B. Gangel-Jacob, J.), entered July 13, 1992, which, *inter alia,* granted plaintiff's motion for summary judgment dismissing defendant's counterclaims for rescission of the parties' postnuptial agreement, directed defendant to pay the guardian ad litem's supplemental fee of $11,163.37, and directed a hearing on allocation between the parties of the guardian ad litem's total fees (including an earlier award of $13,377.15), should be modified, the award to the guardian ad litem vacated, and the direction that there be a hearing on allocation deleted as moot, and except as so modified, affirmed.