[823 NYS2d 35]

# Lora Kojovic, Respondent, v Neal Goldman, Appellant.

First Department, October 19, 2006

### APPEARANCES OF COUNSEL

*Clair, Greifer LLP*, New York City (*Bernard E. Clair* and *Jad Greifer* of counsel), for appellant.

*Goldweber, Lauriello* and *Epstein L.L.P.*, New York City (*Josephine Lauriello* and *Elyse S. Goldweber* of counsel), for respondent.

### OPINION OF THE COURT

SULLIVAN, J.

In this action to set aside, on the basis of fraud and overreaching, the parties' agreement in settlement of the husband's divorce action, the husband appeals from the denial of his motion to dismiss the complaint for failure to state a cause of action.

The facts are relatively straightforward. The parties were married in May 1998 and divorced in 2004. At the time of the marriage, plaintiff wife was 22 years of age and had just graduated from college. Defendant husband was 27, with an MBA from Columbia University. There are no children of the marriage, throughout which the husband was the chief executive officer of and a minority shareholder (7% to 8%) in a closely held corporation, Capital IQ, Inc., an information technology company. In the first two years of the marriage the wife worked as a securities analyst at Morgan Stanley and later pursued a career in acting, from which she derived no income. As the record shows, the parties enjoyed a prosperous lifestyle during the marriage.

The wife alleges that in May 2004 the husband announced that he wanted a divorce. He then commenced a divorce action in Dutchess County, where the couple maintained a second home. The wife thereupon commenced her own action for divorce on May 14, 2004 in New York County. The parties then exchanged financial information including lists of assets and statements of net worth. The husband included in his disclosures his minority interest in Capital IQ. It is undisputed that the parties affirmatively decided not to conduct further discovery. Instead, on August 5, 2004, less than three months after both actions were commenced, they settled all issues incident to the

divorce pursuant to a comprehensive settlement agreement that they negotiated with the assistance of their attorneys.* Pursuant to the settlement, the wife received $1.15 million in cash, rehabilitative spousal support of $350,000 payable over four years, which she continues to receive, and certain other considerations. The husband retained, among other things, his minority shareholder interest in Capital IQ.

In addition to waiving an appraisal and valuation of the husband's minority interest in Capital IQ and the taking of his deposition, the wife further stipulated in the settlement agreement as follows:

> "Each party has made inquiry into the financial circumstances of the other and is sufficiently informed of the income, assets, and financial condition of the other. . . . The parties further acknowledge that the Husband has provided the Wife with additional information concerning his business interests, which information she has had independently reviewed by an accountant. The Wife acknowledges that she has the right of further inquiry including the taking of depositions and a forensic evaluation of the value of the Husband's shares of his business, Capital IQ, Inc., and knowingly waives the same."

Shortly after agreeing to settle the divorce action issues, Standard & Poor's (S & P), a division of McGraw-Hill Companies, formally submitted a nonbinding expression of interest to purchase Capital IQ subject to various stated contingencies, including the satisfaction of six pages of itemized due diligence requests, the receipt of governmental approvals and the approval of the board of directors of McGraw-Hill. On September 8, 2004, slightly more than one month after execution of the settlement agreement, S & P announced that it had entered into an agreement to acquire Capital IQ, which, of course, included the husband's 7% to 8% minority interest. Nine days later, S & P purchased Capital IQ for approximately $225 million, of which the husband received $18 million.

The wife thereafter commenced this action for fraud, reformation, breach of contract and rescission of the settlement agreement, claiming that it was procured through fraud based on her husband's affirmative misrepresentations as to the non-

---

* The settlement was reached in the Dutchess County action and the New York County action was discontinued.

liquidity of his Capital IQ shares. She asserts an obligation on the husband's part to have disclosed to her the value and potential sale of Capital IQ. She also contends that he knew of the imminent sale of Capital IQ at the time of the settlement, but concealed this information from her.

The husband moved pursuant to CPLR 3211 (a) (1) to dismiss the complaint, citing precedents from this Court and relying upon the settlement agreement waivers. Supreme Court denied the motion, finding that here, unlike those cases in which settlement agreements were upheld, the wife alleged an affirmative misrepresentation, upon the discovery of which she promptly brought this action. We reverse.

The wife's action is barred by precedents from this and other courts, which, out of respect for the integrity and finality of divorce settlements, reject such claims. In *DiSalvo v Graff* (227 AD2d 298 [1996]), this Court held that a party may not challenge the validity of a settlement agreement based on a claim that she undervalued assets which, the record showed, were disclosed by her former spouse and known to her at the time. In *DiSalvo,* where the allegations are substantially similar to those here, the motion court found the former wife was aware, at the time of the settlement of the divorce action, that her husband was the founder and 50% shareholder of a privately held company. Under the terms of the settlement agreement, the wife in *DiSalvo* kept the couple's valuable shares of a publicly traded company while the husband retained his 50% interest in the closely held company. Six months later, the husband's company "went public" and his interest became worth millions of dollars. The wife commenced a fraud and rescission action to set aside the settlement agreement, claiming that the husband was aware of the privately held company's value at the time the settlement agreement was executed "and that it would 'go public' six months after the execution of the agreement" (NYLJ, Aug. 4, 1995, at 22, col 5). Plaintiff's claim here is analogous.

In affirming the dismissal of the wife's action in *DiSalvo,* this Court emphasized that the wife "specifically acknowledged that she had made her own independent investigation of [the husband's] business affairs and was waiving further disclosure" (227 AD2d at 298). That is precisely the case here. Despite the remarkable factual and legal similarities, Supreme Court, in denying the husband's motion, distinguished the instant matter from *DiSalvo* on the ground that "[h]ere plaintiff does not claim that defendant hid the existence of his stock or his ownership

interest." This is a fallacious distinction. The wife in *DiSalvo* never claimed that her husband had failed to disclose, fairly and accurately, his ownership interest in the privately held company. As the motion court in *DiSalvo* noted, her claim was rather that her husband had failed to disclose the value of that interest. Supreme Court also distinguished *DiSalvo* on the ground that "it was not possible for [the wife] to discover that talks may have been underway between Capital IQ and S&P since this would not have been public information she would have been able to discover." This ignores a wife's right to inquire into her husband's finances, including the taking of depositions and a forensic evaluation, which, in the settlement agreement, the wife explicitly waived. Thus, contrary to Supreme Court's holding, the cases are similar in that regard.

The wife's attempts to distinguish *DiSalvo* are unavailing. The *DiSalvo* motion court made no distinction between withholding information about valuation and withholding information that a sale is imminent. The plaintiff there alleged that her former husband had been aware of the company's value at the time of the settlement, and that it would "go public" six months later. Whether characterized as an issue of valuation or imminent sale, the court found the claim insufficient. Nor is there any difference, as the wife contends, between the allegation in *DiSalvo* that the husband knew the company would go public and the claim here that the husband knew a sale of Capital IQ was imminent.

Similarly unpersuasive is the argument that the wife in *DiSalvo* was pregnant with another man's child and thus, in agreeing to the settlement, obtained the "quick" divorce she bargained for, whereas, here, as the wife alleges, it was her husband who wanted the quick divorce. This is a distinction without relevance. The fact that here the husband wanted the quick divorce would be relevant only if the wife had been subject to undue duress or so desperate for a speedy resolution as to render the agreement unconscionable. But the concept of unconscionability is reserved for the type of agreement so one-sided that it " ' "shock[s] the conscience" ' " such that " ' "no [person] in his [or her] senses and not under delusion would make [it] on the one hand, and . . . no honest and fair [person] would accept [it] on the other" ' " (*Christian v Christian,* 42 NY2d 63, 71 [1977]). It is, of course, uncontroverted that the wife, highly educated and intelligent, with professional experience as a securities analyst, counseled by experienced matrimo-

nial attorneys and an accountant she had retained to conduct an independent review, determined that she required no further information about Capital IQ. Moreover, by her own admission, the wife resisted her husband's first attempt at a quick divorce, which shows that she was under less pressure to rush to settlement than was the wife in *DiSalvo*. Thus, there is no basis, factually or legally, to distinguish *DiSalvo* from the instant case.

This Court does not stand alone in its disdain for postdivorce claims of concealment. In *Martin v Martin* (74 AD2d 419 [1980]), the former wife sought to reopen the parties' settlement agreement, alleging that her husband had concealed the value of their equity in the marital residence. In refusing to set the settlement agreement aside, the Fourth Department emphasized that the wife had been fully aware of the asset's existence and that the equity in the home was "easily ascertainable" (*id.* at 424), even if the husband had concealed it. Furthermore, the Court stated that "a husband's failure or refusal to disclose his financial circumstances when the agreement is executed is not sufficient to void an agreement fair on its face, particularly when the wife was represented by counsel during the negotiations and execution" (*id.*; see *Fishof v Grajower*, 262 AD2d 118, 119-120 [1999] ["divorce settlement agreement that has been negotiated between two independently counseled parties . . . will not be set aside simply because entering into such an agreement may have been improvident on the part of one of the parties"]).

Here, as in *DiSalvo*, the wife opted for expediency and was divorced within approximately four months after the divorce actions were commenced. She received $1.15 million in a tax-free lump sum and $87,500 yearly for four years, a not inconsiderable settlement for a six-year, childless marriage.

In *McFarland v McFarland* (70 NY2d 916 [1987]), the Court of Appeals rejected a challenge to a separation agreement incorporated but not merged in a Dominican Republic judgment of divorce. The former wife's claim included allegations that the husband had understated the value of his partnership interest in an investment firm and had failed to disclose an impending restructuring of the firm that would have increased the value of his interest. The Court rejected the claim as a basis for setting aside the agreement, noting that while favorable to the husband, it was neither facially irregular nor unconscionable, and that the wife had been represented by independent counsel of her own choosing at the time of its execution.

Although "tested carefully" when subjected to attack to make sure that the agreement was " 'just and fair' " (*Christian,* 42 NY2d at 65), a stipulation of settlement in a divorce action, competently entered into, is entitled to the recognition accorded any other contract. "Judicial review is to be exercised circumspectly, sparingly and with a persisting view to the encouragement of parties settling their own differences in connection with the negotiation of property settlement provisions" (*id.* at 71-72). There is a "heavy presumption that the deliberately prepared and executed postnuptial agreement manifest[s] the true intention of the parties" (*Haynes v Haynes,* 200 AD2d 457, 457 [1994], *affd* 83 NY2d 954 [1994]), necessitating "a high order of evidence . . . to overcome that presumption" (*Brassey v Brassey,* 154 AD2d 293, 295 [1989]). As noted in *Christian* (42 NY2d at 72), "courts should not intrude so as to redesign the bargain arrived at by the parties on the ground that judicial wisdom in retrospect would view one or more of the specific provisions as improvident or one-sided."

The wife also argues that the settlement agreement should be set aside because it is unconscionable, relying principally upon *Chapin v Chapin* (12 AD3d 550 [2004]). There, the parties entered into a stipulation of settlement of a judgment against the husband for arrears under an original agreement based upon the husband's representation that he had an income of some $15,000 the previous year and "virtually no assets" (*id.* at 550). Shortly thereafter, the wife learned that the husband had purchased hundreds of acres of waterfront property in Nova Scotia, despite his claim of having virtually no assets. The Second Department held that the agreement was the product of fraudulent inducement and set it aside. While *Chapin,* at first blush, seems to support the wife's claim, upon further reflection it is readily distinguishable, since *Chapin* involved the concealment of assets, not, as in *DiSalvo* and the instant case, the valuation or possible sale of an asset.

In *McCaughey v McCaughey* (205 AD2d 330 [1994]), this Court recognized the distinction. There, a husband attempted to avoid a settlement, in part on the ground that he had become unemployed a year after the execution of the agreement. This was a risk he should have been aware of at the time he executed the agreement. In refusing to set the agreement aside, we held that "contrary to [the husband's] claim, since he was aware of the possibility that he might be unemployed the year after he made the agreement, it cannot be said that the conditions to which he agreed were unfair" (*id.* at 331).

As in *Chapin*, the wife here, given her professional background and the advice furnished by her counsel and accountant, should have been aware of the distinct possibility that Capital IQ would be sold. That she opted for an immediate and certain payout instead of the uncertainty of an eventual sale does not afford a basis for setting aside the agreement.

In this regard, the wife concedes, as she must, that the husband consistently and accurately disclosed the full extent of his minority interest in Capital IQ, an asset of speculative value at the time the settlement agreement was executed. That the wife now believes her husband privately harbored a more optimistic assessment of the potential value of his minority interest in that company, or even had additional information that he kept to himself, is irrelevant. What is significant is that the wife, a former equity research assistant at Morgan Stanley with a degree in finance, along with her experienced counsel and accountant, could have freely availed themselves of any number of valuation and discovery procedures during the divorce proceeding but declined to do so, as is expressly acknowledged in the settlement agreement. Thus, the wife has only herself to blame for her failure to inquire further. Such failure is not, however, a basis upon which to vacate the settlement.

We have examined the wife's other arguments and find that they are without merit.

Accordingly, the order of the Supreme Court, New York County (Joan B. Lobis, J.), entered December 5, 2005, which denied defendant's motion to dismiss the complaint on documentary evidence, should be reversed, on the law, without costs or disbursements, and the motion granted. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint.

FRIEDMAN, J.P., MARLOW and CATTERSON, JJ., concur.

Order, Supreme Court, New York County, entered December 5, 2005, reversed, on the law, without costs or disbursements, and the motion granted. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint.